And we'll move to our fourth case this morning, which is Madden v. the Department of Veterans Affairs. Mr. Garbus. Good morning, Your Honor. My name is Dan Garbus. I represent the plaintiffs and appellant in this matter, Felicia Madden, in the estate of Philip Madden. This is an appeal based off a bench trial, and at the bench trial, the defendant, the U.S. Government, the VA hospital, was found to be not liable for the... As I understand, it's a question of credibility, is it? It is, Your Honor. Basically, the entire... Because of the fact that both experts, the VA's expert as well as the plaintiff's expert, agreed on certain matters that the VA hospital had failed to meet its standard of care. But the ultimate question they didn't have a concurrence on. The ultimate question they didn't have a concurrence on, however, again, Dr. Schwartz, who was that they both concluded were violations... In the final analysis, they had different conclusions as to whether anything was done wrong. Yes. There was a final... That's a question of credibility and finding a fact, is it not? It is. It is, Your Honor. However... How do we get to revert? Well, based on the manifest weight of the evidence, that's where the appeal comes in. That's not the standard of review. Excuse me? That's not the standard of review. We're talking about clear error review of factual findings. Manifest weight of the evidence is not an appellate standard of review. Well, the clear facts also indicate that there was instances, like I had mentioned earlier, where the VA hospital's expert had testified that there were violations of the standard of care. That doesn't matter. If the district court, as the fact finder, the judge here, found that your expert was sorely lacking in credibility, while Dr. Schwartz was highly credible, unless that was clearly erroneous, you can't prevail, and you haven't identified anything that's clearly erroneous about that. So the evidence was based on the fact that Dr. Hussain had a short resume as opposed to Dr. Schwartz's resume, and there was also instances where the court found that Dr. Hussain's credibility was lacking based off of cross-examination questions and not based off of actual facts that were misstated. Well, whatever. He arrived after listing all the evidence at the conclusion that one doctor was credible and the other one was not, and it made the difference between liability and not liability. Am I correct? That is correct. That's what the judge found. Well, I don't know how. How can it possibly be clear error, or an abuse of discretion, for Judge Shader to have credited Dr. Schwartz over Dr. Hussain? Excuse me? I'm wondering how it could have possibly been clear error, or an abuse of discretion, for Judge Shader to credit Dr. Schwartz over Dr. Hussain under the circumstances here. Well, Your Honor, as I had mentioned earlier, the errors were such as, for example, that testimony that, and I believe the quote was that it was obvious that Mr. Madden didn't have TB. However, he was isolated for five days, which is, again, beyond the 72-hour standard that was required. That TB isolation in itself caused Mr. Madden to have extreme stress on his body. Secondly, Dr. Schwartz – I – stop right there, because I honestly do not understand how placing Mr. Madden in isolation concretely harmed him. I really would like to understand. Well, here's how it concretely harmed him. Mr. Madden's history indicated that he had COPD as well as some heart issues. If he had been placed in a cardiac intensive unit as opposed to the respiratory unit, there would have been machines and different medical devices, as well as the medical staff – But it was not like that. Excuse me? It was on telemetry. Telemetry. Yes. He was on – I'm sorry. True, Your Honor. But the – Telemetry. And an alarm did go off when he collapsed in his chair. But, again, because of the fact that he was in that unit as opposed to a cardiac intensive unit, the Code Blue team didn't have certain personnel that would have assisted Mr. Madden in his recovery. And, I mean, for instance, there was an anesthesiologist.         That's not true. That's not true. That's not true. That's not true. That's not true. That's not true. How long did it take for personnel to get to his room and begin the efforts to resuscitate him? That wasn't the issue. It was probably within minutes. However, the right personnel wasn't there. That's the issue. The right personnel wasn't there. Secondly, it's clear based on the medical record that it took him 25 minutes to intubate him. Why – Well, stop for a minute. Who was there and who would have been there under the other circumstance? Well, a proper personnel, an anesthesiologist, a person that could have done – A person that could have intubated him properly and not taken 25 minutes to intubate him. But there's a lot of back and forth on whether, you know, the tracheotomy, you know, would have been a good idea here. It wasn't done because, again, they didn't have the proper personnel. All of this begs the issue. The issue is whether or not the judge has committed a reversible error in his finding of credibility. Well, the point is that he dismissed Dr. Hussain outright just based on his resume as opposed to listening to the evidence of the case. Whatever the predicate for it was. Excuse me? Whatever the predicate for his finding. It was on the record. He made a finding of fact, and I don't know how you can quarrel with it. I quarreled with it with mentioning all the critical errors that the VA hospital committed and the fact that Dr. Schwartz, who was the VA hospital's expert, agreed and concurred that most of these facts were, in fact, errors, such as placing him on wheelchair. So you come to whichever conclusion the doctor who testified against your position, but that's you. The judge didn't. He credited one side against the other, which is what he has to do, and that should end the case. Well, Your Honor, I mean, based on the fact that Mr. Madden lived an additional two years after this catastrophic brain injury, based on the fact that the family, after the two years, pulled him from life support and he lived an additional two weeks without life support, all that shows that Mr. Madden would have survived this if he had the right personnel. All that shows that if God were in a different position, he'd still be alive today. Probably. I think my light is on. I'll reserve the rest of my time for rebuttal. Thank you, Your Honor. Thank you. Ms. Hancock. Do you find any quarrel with my position? Do you? May it please the court, counsel? No. No, I don't have any quarrel with it. See if you can talk me out of it. I'll keep my remarks brief. Thank you. I'd just like to go to- Do we know how much time elapsed between the first effort to intubate Mr. Madden and the successful effort to intubate him on the second try? No, and that's a key point. Appellant repeatedly states that it's undisputed that it took 25 minutes to intubate Mr. Madden. Dr. Hussain conceded numerous times on cross and on redirect that the records just don't make clear how long it took to intubate Mr. Madden. What we know is that it took 25 minutes. There was a 25-minute code blue, and there was 25 minutes to obtain a pulse, but Dr. Hussain testified that it could have been as little as three minutes to intubate Mr. Madden. There's also no evidence that wrong people were there, so Mr. Madden was intubated by an ER attending. Dr. Schwartz, our expert, testified that that is a perfectly appropriate person to perform an intubation in a code blue. Dr. Schwartz also testified that the standard of care doesn't require you to jump to a tracheotomy before you've attempted intubating a person twice, particularly a person such as Mr. Madden who has, who is very large and had very few physical landmarks that would allow you to safely perform a tracheotomy in an emergency situation like a code blue. I'd like to briefly- What do you mean by landmarks? Pardon me? What do you mean by landmarks? Physical landmarks. Tracheotomy, just go into the neck, don't you? So what Dr. Schwartz explained during her testimony is that, you know, you have to figure out where in somebody's neck to make the incision to make a tracheotomy and you palpitate their neck and you look, you know, I don't know the actual technical names of the landmarks, but you have to look physically on someone's neck and then palpitate with your hands to figure out where to make the incision. And Mr. Madden- That's a comforting thought, that they look around and see they got the right place. And what she explained is that someone, Mr. Madden, he was on this blood thinner called Coumadin. His neck was probably swollen. We know he had a large tongue. The medical reference, pardon me, the medical references make numerous references to the they weren't really able to assess his neck very well because it was swollen and because he was large. And so she said- How large was he? He weighed a little bit less than 400 pounds. So what the parties agree on is that when he was admitted to the hospital on December 28, 2007, he weighed, I believe, 393 pounds. Like five foot six. And he was five foot six, yes. And he was in very poor overall health. The credibility finding that the judge made as a factual matter was not based merely on the difference in resumes between the two experts. There was much more to it than that. As I read this opinion, it was based on the evasiveness of the plaintiff's expert, Dr. Hussain. It was based on his personal relationship with the family and his testimony that he was getting involved in the case as a personal favor to the family, the fact that he had very little by way of medical support for his opinion other than information that he gathered from family members, and had attached maybe eight pages of a 2,000-page medical record to his opinion. So it's not just a mismatch in terms of qualifications. Yes, obviously we agree with that. You know, what I would add to the list of deficiencies that you just recited is that, you know, Dr. Hussain's testimony, he was mistaken and inaccurate about so many of the medical records, and he was confronted with specific medical records over and over again on cross-examination. And over and over again, he testified that he was mistaken or he hadn't reviewed the records or he wasn't aware of them. And I think that really, rightly so, played a big part in the court's credibility determination, which, you know, after all, is how much weight should he give one expert versus another? And Dr. Hussain really was not able to substantiate his opinions at all, and then conceded that many of his opinions were mistaken. I would also like to clarify, and I think this comes through from our briefs, but Dr. Schwartz did not agree with Dr. Hussain's opinions on the key breaches of standard of care. That's not accurate. Could you please talk about the question of whether Mr. Madden spent three and a half days or three days versus five days in respiratory isolation and how that impacted the case? It did not have a big impact on the case. You know, our position, which was based on Dr. Schwartz's testimony, was that the TB isolation, in her words, it was a distractor. She testified that, look, he would have received the same level of care irrespective of whether or not he was in isolation or not. I think, you know, it's difficult to, there was confusion during trial about how many days Mr. Madden was in isolation. What we know is that it looks like he started out in isolation late in the evening at the evening, early morning of January 1st. So that's about four days. The plaintiff argued that this was relevant because he should only have been in TB isolation for 72 hours. Dr. Hussain opined that it was a breach of the standard of care to have kept him in isolation for more than 72 hours. Dr. Schwartz testified that she didn't think it was a breach of the standard of care. In any event, there was no evidence at all that Mr. Madden was harmed by the fact that he was in TB isolation, just as there was no evidence at all that Mr. Madden was harmed by the fact that he was on the telemetry floor instead of in the coronary care unit. In fact, you know, Dr. Hussain testified at one point, I don't think there was any delay in care for Mr. Madden. So you know, the issue of whether he should have been in the CCU or whether he should have been in isolation is really a non-starter. There was no injury. There's no evidence at all that there was any delay. I'd like to address two issues that, or two alleged breaches of the standard of care that have come up over and over again, both at trial and in the appellant's brief. The first is whether it was appropriate to keep Mr. Madden sitting in a wheelchair. There's again, there's no evidence that sitting in a wheelchair injured Mr. Madden, and I'd also like to point out that also the records show that Mr. Madden wasn't exclusively in his wheelchair during his entire second hospital stay. There are references to the fact that he was sitting up in bed sometimes. He was sleeping sometimes. He could move around. The reason Mr. Madden was allowed to sit in his wheelchair, and it appears for extended periods of time, and obviously sleep in his wheelchair because that's where he was when there was a code blue, was because that's how he could breathe. He found that to be more comfortable. He had, and Dr. Schwartz testified that when you have a patient exhibiting the symptoms that Mr. Madden did, breathing is a priority, and so you want to make him as comfortable as possible. If it was comfortable for him to sleep in a wheelchair. Breathing is pretty much a priority for all of us, if you will. We should let him do that. The second alleged brief that I do want to address is this issue of whether it was appropriate of the intubation on the floor. As I would like to reiterate, there was no evidence that it took a full 25 minutes to intubate Mr. Madden. Also, it is not the case that it's undisputed that the intubation was difficult because Mr. Madden was on the floor. What Dr. Schwartz explained is that the intubation was going to be difficult because of the large size. Her opinion was that it might even have been easier to work on the floor because it provided a firm surface when you're doing chest compressions on somebody of Mr. Madden's size in a code blue. And as common sense would tell us, when Mr. Madden was found unresponsive in his wheelchair, it made more sense to lower him to the floor rather than try to get eight people or however many people it would have taken to lift an unresponsive 400-pound man onto a bed. That's done in the field with some regularity, isn't it? Lifts of that type? Well, EMTs coming upon that sort of scene in the field would use that procedure, I assume. Maybe there wasn't testimony on this point, but it seems to me a logical response to the situation. Yes, I would agree. There wasn't testimony on EMTs. What Dr. Schwartz said, and again, this seems like a common sense perspective, is she said, look, you didn't really have any alternative. You want to get to work on him as fast as you can, so you move him onto the floor and you get to work and you intubate him as fast as you can. Unless the court has... Go ahead. I was going to say, unless the court has any further questions, I have... All right. We would ask that you affirm the decision of the district court. Thank you. All right. Mr. Garbus? Seven minutes. Okay. You've got a bit of time left. I'd like to address the first thing about Dr. Hussain being evasive and non-responsive to some of the questions. Most of the evasive or non-responsive answers were based off cross-examination questions that were presented by the U.S. attorney. Why does that make a difference? Well, it makes a difference because a lot of the U.S. attorney's cross-examination questions were hypothetical, such as Ms. Hancock had just mentioned earlier. Why does that make a difference? I'll tell you why. Because when she asked him, when she pressed Dr. Hussain about, well, it wasn't 25 minutes to intubate him. It could have been three minutes. That's based off the medical record. The medical record said 25 minutes to properly intubate and to get a pulse from Mr. Manning. The question was presented, if I remember correctly, as to, well, it could have been less than 25 minutes. And at that point, Dr. Hussain, based off the medical record, said, yeah, I guess it could have been based off, you know, the way it was written. The U.S. attorney never presented any witnesses to contradict the medical record. They didn't present anyone from the VA hospital that was there at the code blue to actually testify how long it took to intubate Mr. Manning. Therefore, the only logical conclusion was that it could have taken 25 minutes. But as the U.S. attorney mentioned, it could have taken less than 25 minutes. The record wasn't clear. The medical record wasn't clear. I think that's where Dr. Hussain was viewed as being evasive. He was being evasive off a hypothetical question, not an actual direct question. That's only for the hypothetical questions. Now number two, the other issue, and I think Ms. Hancock hit upon this, obesity was the main problem here. Mr. Manning was an obese patient. The VA hospital treated him differently because of the fact that he was obese. Rather than getting him the proper bedding, they allowed him to transfer himself in and out of a wheelchair, back to the side of a bed, back to a wheelchair. It would have been proper, and Dr. Hussain testified to this, to have a proper bed that could have accommodated a man of his size. Didn't have that proper bedding. Secondly, the isolation, well, it wasn't a big deal to have him in isolation. We contend, and Dr. Hussain admitted this, and I think Dr. Schwartz even stated that this was correct. Having a patient in isolation for that much time wears on a person, especially a person of- What Dr. Hussain says, or doesn't say, doesn't make any difference on appeal in the teeth of an adverse credibility finding. But Dr. Schwartz also- So reciting his testimony isn't going to get you very far. No, no. Unless you can overcome the adverse credibility finding, it doesn't matter what he testified to. Well, I'm saying that Dr. Schwartz also agreed to the fact that having a patient in isolation for that long is not conducive to their health and maintaining them in their health. A lot of the points that I was saying earlier was that Dr. Schwartz may not have necessarily agreed with the facts that the standard of cares were violated, but she did agree that these issues occurred, such as the fact that he was in a wheelchair, and that being in a wheelchair for such sustained periods of time would cause severe stress on a person and his lower extremities, especially a person of Mr. Madden's size. So there was ample evidence, even with Dr. Hussain being deemed to be not credible, there was ample evidence that showed that the VA hospital did not meet its standard of care when it came to providing medical care to Mr. Madden. Any other questions? Anything further? No. All right. Thank you. Thank you. Thank you. Mr. Gerbers, our thanks to both Council. The case is taken under advisement.